IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                   Criminal Action No. 3:18-cr-00090-JAG-1

LEONUS STEVENSON PETERSON,
Defendant.

## OPINION

Leonus Stevenson Peterson moves to suppress evidence that the police obtained following

a traffic stop on June 22, 2018. Specifically, Peterson asks the Court to suppress evidence seized

following a car search conducted with and without a warrant, evidence seized following a strip

search, and statements he made to the police after the strip search. For the reasons that follow, the

Court will suppress the fruits of the strip search but not the fruits of the car search.

## I. BACKGROUND

### A. *The Overdose and Resulting Investigation*

On November 29, 2017, Elizabeth Rosie died from a heroin overdose in Caroline County,

Virginia. Officers from the Tri-County Drug Task Force—including Special Agent Steven J. Aziz

of the Drug Enforcement Agency ("DEA"), Investigator Benjamin Sadler of the Caroline County

Sheriff's Office, and Investigator Michael Lewis of the Caroline County Sheriff's Office[1]—

responded to the overdose at Mrs. Rosie's home. When the officers arrived, they spoke to Mrs.

Rosie's husband, Gregory Kenneth Rosie. Mr. Rosie told the officers that the source of the heroin

---

[1] Officers from the DEA, Virginia State Police, Caroline County, King George County, and
Westmoreland County comprise the Tri-County Drug Task Force. The officers assigned to the
Task Force's investigation into Peterson included Aziz, Lewis, and Sadler. The Court will refer
to Aziz, Lewis, and Sadler as "the officers."

was a Richmond-based dealer called "Doe or Doughboy." Hr'g Tr. 276:17-18, Feb. 26, 2019 (Dk. No. 121); Mar. 8, 2019 (Dk. No. 122).

Mr. Rosie also told the officers how he obtained the heroin that resulted in his wife's overdose. He said that he paid Jenna Rose Queen, who in turn contacted the Richmond dealer. Several times a week, Marcus Watson drove Queen to Richmond to meet the dealer. The officers later interviewed Queen and Watson, who corroborated Mr. Rosie's account.[2] Queen identified Peterson as "Doe or Doughboy." *Id.*

Queen also showed the officers her text messages with Peterson. After Queen texted Peterson with her requests, Queen and Peterson arranged to meet "at the usual place"—a location near a McDonald's in the Shockoe Bottom neighborhood of Richmond. *Id.* at 279:10. Queen said that she met Peterson inside his black SUV for several minutes outside the McDonald's. After completing the transaction, Watson drove Queen back to Caroline County, where she distributed heroin to Mr. and Mrs. Rosie and others.

Based on the information the officers learned from Rosie and Queen, the officers began conducting regular surveillance of Peterson. Aziz testified that the officers watched Peterson meet "with several people throughout the course of the night for very short times." *Id.* at 282:15-16. For example, the officers—including Aziz and Lewis—followed Peterson to a Wal-Mart parking lot in Richmond on May 29, 2018. The officers watched Peterson get out of his car, walk to the

---

[2] Lewis was involved in "[s]ome . . . but not all of" the interviews with Queen. *Id.* at 295:15-16. Lewis, however, remained a member of Task Force assigned to Peterson's case throughout the investigation, so Aziz and Sadler kept him apprised of the investigation's status. *Id.* at 295:17-18. Aziz testified that Lewis "play[ed] an integral part in" the investigation, participated in the surveillance of Peterson before the traffic stop, and knew about Queen's text messages with Peterson. *Id.* at 294:19-295:6.

driver's side window of another car, and hand the driver an object. The officers later identified the driver as Eric Davis, a heroin user who overdosed in August, 2017.

Based on the surveillance of Peterson and the interviews with Queen and Watson, Aziz obtained a GPS tracking warrant for two of Peterson's cars, including a white Chevrolet van and a black Mercedes-Benz.[3]

## B. The Planned Traffic Stop and Warrantless Search

On June 22, 2018, the GPS tracker showed the black Mercedes traveling north from Richmond to Baltimore, Maryland. The officers found Peterson's travel "out of the ordinary" because he tended to remain in the Richmond area. *Id.* at 285:18-19. After arriving in Baltimore, Peterson made a brief stop on West Fayette Street, which Aziz knew to be "a heroin corridor."[4] *Id.* at 288:15-16.

Aziz knew that Peterson had a suspended driver's license, so he decided to instruct the other officers to conduct a traffic stop during Peterson's trip back to Richmond. Aziz first contacted Special Agent Steven Davis of the DEA field office in Washington, D.C. Davis located the Mercedes traveling south on Interstate 95 near Woodbridge, Virginia, and confirmed that Peterson was the driver.

Lewis, Sadler, Trooper Derek Russell of the Virginia State Police, and other officers met in a parking lot near an exit ramp off Interstate 95 in Spotsylvania County, Virginia. Russell ran Peterson's name and date of birth in his database, which confirmed that Peterson had a suspended

---

[3] In Aziz's affidavit in support of the search warrant, he provided detailed accounts of the officers' surveillance of Peterson and his interviews with Mr. Rosie and Queen. The affidavit refers to Mr. Rosie as "Target 2" and Queen as "Target 3." Pl.'s Ex. 7, at 3-6.

[4] Aziz became familiar with drug trafficking in Baltimore based on his previous experience serving on a DEA mobile enforcement team to help Baltimore authorities combat drug trafficking and violent crime. *See id.* at 286:23-288:4.

driver's license and showed a 2005 arrest from Maryland involving "large quantities of drugs [taped to] the inside of [Peterson's] thigh." *Id.* at 148:6-7. Lewis, Sadler, and Russell decided to conduct "a normal traffic stop" to avoid exposing the larger Task Force investigation. *Id.* at 149:1.

At approximately 8:00 p.m., Russell[5] spotted the black Mercedes traveling south on Interstate 95. He saw Peterson hit the brakes "extremely hard[,] causing the front of the vehicle to go down." *Id.* at 149:24-150:1. Russell also noted that Peterson did not have has headlights on, despite the drizzling rain and overcast weather conditions. After Russell pulled onto the highway, Peterson moved to the center lane closely behind a black Dodge Charger, which Aziz was driving. Russell then turned on his emergency equipment and stopped Peterson.

After Peterson pulled over on the right shoulder, Russell approached the passenger's side of the car and asked Peterson for his license and registration. Russell observed that Peterson "was sweating profusely, was trembling, in an attempt to locate his license." *Id.* at 151:7-8. After Peterson admitted that he had a suspended license, Russell ordered him to get out of the car and to step in front of Russell's patrol car in the middle of the shoulder to avoid oncoming traffic. At that time, Lewis pulled up in an undercover car a short distance behind Russell's marked patrol car. Russell returned to his patrol car to verify that Peterson had a suspended license.

Next, Russell signaled for Lewis to pull closer to the scene of the traffic stop. Lewis then got out of his car with Walker, a drug detection dog.[6] Lewis approached Peterson, explained that he had a drug detection dog with him, and told Peterson that he planned to "screen" Peterson's car

---

[5] Trooper Rose, an officer in training, accompanied Russell during the traffic stop.

[6] Lewis has worked as a drug detection dog handler since August, 2015. Every year since his initial certification, the Virginia State Police Working Dog Association has recertified Lewis as a handler. Additionally, Lewis and Walker undergo monthly supervised training with qualified canine handlers. The government submitted Lewis' certifications, training notes, and monthly reports regarding Walker. *See* Pl.'s Ex. 6, 8. Walker detects marijuana, cocaine, methamphetamine, ecstasy, and heroin, but does not detect fentanyl due to safety concerns.

and his person. A "screen" of a car involves a two-step process, which Lewis uses "every time" Walker detects drugs in the field. *Id.* at 26:3-5. First, Walker completes an "undirected pass" or a "dog pass," in which Lewis allows Walker to run around the car to try to detect drugs without any direction. *Id.* at 25:13-21. Second, Lewis completes a "detailed pass," in which Lewis directs Walker "to go up and down on the vehicle" to try to detect drugs on "different areas of the vehicle that [Walker] might not have gotten on [his] own undirected." *Id.* at 25:24-26:2.

To complete the undirected pass on Peterson's car, Lewis first released Walker by the front of the car. Walker "casted" by the driver's side headlight, *id.* at 24:25, meaning that he went "back and forth" on the car to try to "pinpoint the source [of the odor]." *Id.* at 26:17-24; *see also id.* at 28:12. When cars travel at high speeds—as the Mercedes had been before the stop—the wind pushes any drug odor from the inside of the car to the front of the car, where Walker casted. *See id.* at 27:2-5. According to Lewis, a drug detection dog indicates to its handler that it smells drugs either through an "alert" or a "response." *Id.* at 30:5-9. For Walker, "[a]n alert is any change in behavior that is consistent with when [Walker is] within the odor of a narcotic." *Id.* In contrast, "a response is an actual sit." *Id.*; *see also id.* at 49:15-18. In other words, Lewis refers to an "alert" as some weaker indication that Walker smells drugs than a "response."[7] Lewis interpreted Walker's casting by the driver's side headlight as an alert.[8] *Id.* at 26:11-14.

---

[7] Whether Walker gives a weak response or a strong response depends on the strength of the odor. For example, Walker might give a weak response if he smelled a residual odor of drugs. *See id.* at 54:20-22.

[8] In this Opinion, the Court will distinguish between a "weak response," which Lewis calls an "alert," and a "strong response," which Lewis calls a "response." Walker displays a "strong response" when he sits. Any other change in behavior suggesting that Walker smells drugs is a "weak response." *See, e.g., United States v. Wilson*, 995 F. Supp. 2d 455, 473-74 (W.D.N.C. 2014) (explaining the terminology related to drug detection dogs).

Next, Lewis began the detailed pass by directing Walker to the passenger's side door,[9] where Walker stopped and looked at Lewis. Lewis interpreted Walker's behavior by the passenger's side door as an alert. *See id.* at 32:23-33:2 ("He is telling me there's an odor of narcotic specifically in that vehicle.").

After Lewis completed the detailed pass, he told Peterson that he would screen Peterson's person. When Walker smelled Peterson's right hand, Walker stopped, paused, and looked back at Lewis. Lewis interpreted Walker's behavior as an alert.[10] *See id.* at 35:6-11.

Meanwhile, Peterson told Russell that he was returning to Richmond from a trip to northern Virginia. After Russell asked Peterson if he had anything in the car, Peterson told Russell that he recently had the car detailed, so Russell would not find anything. *Id.* at 154:8-13. Lewis told Peterson that Walker had alerted on the Mercedes and Peterson's person. When Russell asked Peterson why Walker alerted on his right hand, Peterson said that he had held "some marijuana" in his hand earlier that day before returning to Richmond, but that the marijuana did not belong to him. *Id.* at 154:15-23.

Based on Walker's alert on Peterson's right hand and Peterson's suspended driver's license, Russell handcuffed Peterson and patted him down. Peterson "seemed to be pretty calm" when Russell patted him down from his neck to his arms. *Id.* at 158:20-21. When Russell got within two to three inches of Peterson's groin area, however, Peterson "clinched up fairly tightly."

---

[9] Russell had been speaking with Peterson from the passenger's side of the car to avoid oncoming traffic, so the passenger's side window was open during the detailed pass.

[10] Peterson introduced evidence that a box of fried chicken was in the front passenger's seat of the car to explain Walker's alerts. Lewis, however, testified that Walker does not alert "on any food whatsoever." *Id.* at 44:12-13.

*Id.* at 158:22-24, 159:14-16. After the initial pat down, Peterson asked Russell if he could leave the scene.[11]

When Russell patted down Peterson a second time, Peterson again clinched as Russell got to his groin area. Russell also noted that Peterson was wearing multiple layers of clothing.[12] Russell tried unsuccessfully to untie the waistband of Peterson's sweatpants to see if Peterson had illegal drugs hidden under his clothes. Russell then told Peterson that he was under arrest for driving on a suspended license and explained that he would be taking Peterson to Pamunkey Regional Jail to appear before a magistrate.

Lewis and two other officers began searching the Mercedes on the side of the road. Lewis found three cell phones and a box of Mannite in a black trash bag. Mannite is the brand name for a mannitol product—a sugar alcohol often used as a cutting agent for illegal drugs. *See id.* at 37:16-24. Shortly thereafter, Lewis called to have the Mercedes towed to Bud's Towing in Caroline County.

### C. The Search of the Car and Phones Pursuant to a Warrant

After the officers had the Mercedes towed, Sadler applied for a search warrant for the Mercedes. In Sadler's affidavit in support of the search warrant, he described the traffic stop in detail. He also described Walker's "casting" by the front of the Mercedes and Walker's alert by the passenger's side door. *See* Pl.'s Ex. 4, at 3 & Attach. A. Sadler further noted that "illegal drug distributors commonly utilized traps and other hiding locations for their illegal narcotics to avoid detection by Law Enforcement." *Id.* at Attach. A. The Magistrate Judge issued the search warrant,

---

[11] Eventually, Peterson's wife arrived on the scene, and asked if Peterson could leave.

[12] Russell testified that Peterson was wearing boxer shorts, two pairs of shorts, and sweat pants, so Russell could not tell whether Peterson had anything hidden in his groin area. *Id.* at 160:18-25. The strip search at the jail, however, revealed that Peterson was wearing only boxer shorts and a pair of sweatpants. *See id.* at 239:6-9, 327:10-14.

authorizing Sadler to search for "[h]eroin, cocaine, methamphetamine, ecstasy, all derivatives, and cutting agents." *Id.* at 2. Other than a wallet and various personal effects, the officers did not find any additional evidence other than the Mannite and three cell phones.[13]

After the officers searched the car at Bud's Towing, Aziz applied for search warrants for the three cell phones. *See* Pl.'s Exs. 1-3. In Aziz's affidavit in support of the search warrants,[14] he explained his knowledge of "the manner and methods by which narcotics traffickers conduct their illegal businesses." *Id.* at ¶ 6. Aziz noted that "narcotics traffickers frequently use numerous cellular telephones to further their illegal activities and to evade detection from law enforcement." *Id.* at ¶ 6(c). Aziz further explained that drug traffickers maintain "[r]ecords and other evidence" of drug transactions in their cell phones, *id.* at ¶ 6(f), including "wire and electronic data concerning telephonic contact, and text messages with co-conspirators, as well as contact lists, 'friends' lists[,] and other compilations of contact information for co-conspirators," *id.* at ¶ 6(g).

After providing a detailed account of the traffic stop and the facts leading up to the search of the car, Aziz explained that he thought "the three cellular telephones located in Peterson's car each contain evidence of Peterson's drug trafficking activities." *Id.* at ¶ 19. According to Aziz, "[i]t is also common for illegal drug traffickers to utilize separate cellular telephones for customers and for sources of supply." *Id.* Because "sources of supply will provide lower-level drug traffickers with a cellular phone to be used solely for the purpose of contacting the supplier," those cell phones "would contain evidence to help identify the source of supply, as well as the locations, frequency[,] and methods of the sourcing of illegal drugs to the drug trafficker." *Id.* Additionally,

---

[13] The officers also noticed that the "natural void area" under the glove box had missing screws, so the officers thought that Peterson had a "trap" in the void space to hide drugs. *Id.* at 264:18-24. A search of the void space, however, revealed no additional evidence.

[14] Other than listing the different makes and models of each cell phone, Aziz submitted identical affidavits in support of each search warrant. *See* Pl.'s Exs. 1-3.

drug traffickers often "have a phone that is used for customers and coconspirators to contact the drug trafficker," so the phones "would contain evidence to help identify the drug trafficker's coconspirators and customers, as well as the locations, frequency[,] and methods of the drug trafficker's distribution activities." *Id.*

Aziz sought (1) "[a]ll records on the telephones and storage device;" (2) "[e]vidence of user attribution showing who used or owned the phones at the time the things described in this warrant were created, edited or deleted;" (3) "[r]ecords evidencing the use of the Internet;" and (4) "[p]hotographs, video recordings[,] or images either taken on or downloaded onto the target devices, that depict Peterson, Peterson's associates, travel, expensive assets[,] . . . large sums of currency, illegal narcotics, firearms, [and] other indicia of illegal drug trafficking." *Id.* at Attach. B. United States Magistrate Judge David J. Novak issued the search warrants on June 28, 2018, finding that Aziz's affidavits established probable cause to search the cell phones. After searching the contents of the cell phones, the officers corroborated Queen's account of her text messages with Peterson.

### D. The Strip Search

After Russell arrested Peterson at the roadside, Russell drove Peterson to Pamunkey Regional Jail to appear before a magistrate. Before entering the facilities, Russell took Peterson through the jail's sally port.[15] While still inside the sally port, Russell twice asked Peterson if he had anything illegal, and warned that bringing contraband into the jail would be a felony offense.

---

[15] The sally port is a secure enclosure connected to the jail. When officers enter the jail through the sally port, they must remove their weapons and place them in a secure area.

Peterson told Russell that he did not have anything illegal. Russell escorted Peterson from the sally port to the magistrate's intake area, which is open to the public.[16]

Russell obtained a warrant from the magistrate and served it on Peterson. The magistrate conducted a bond hearing and granted an unsecured bond for Peterson. The jailor on duty, Sergeant Richard Hagen, came out from the intake area to process Peterson. At Pamunkey, standard procedure for processing involves fingerprinting and photographing defendants. Hagen patted down Peterson, took his personal effects, and then took him to the intake department for processing.

Based on Peterson's "clinching" and the 2005 Maryland arrest, Russell suspected that Peterson had illegal drugs hidden in his groin area, so Russell asked Hagen to strip search Peterson. *See id.* at 194:9. Hagen agreed.[17] Russell testified that he had never asked a jailor to strip search a defendant because Russell had always "gotten [defendants] to admit and pull it out themselves." *Id.* at 183:6-8.

Hagen took Peterson to a private shower area to strip search Peterson. Hagen first directed Peterson to take off all his clothes. After Peterson removed his clothes, Hagen saw "a little baggy sticking out" from the left side of Peterson's groin area. *Id.* at 234:15-17. When Hagen asked Peterson about the plastic attached to his groin area, Peterson removed two plastic baggies and handed them to Hagen. Hagen told Peterson to get dressed, and then returned to the intake area to

---

[16] The magistrate intake area has several chairs and a place for officers and charged parties to speak with the magistrate through a plexiglass window.

[17] Peterson introduced portions of Pamunkey Regional Jail's standard operating procedures to show that the procedures prohibit strip searches of visitors. *See* Def.'s Ex. H, at 5. The issue, however, is not whether Pamunkey's procedures allow or do not allow for strip searches of individuals who are in the jail merely to appear before a magistrate. Instead, the Court must determine whether Hagen violated the Fourth Amendment when he strip searched Peterson. Pamunkey's procedures have no bearing on that question.

speak with Russell. When Russell asked Peterson why he did not tell Russell about the drugs, Peterson said that he was scared and just wanted to go home. Peterson also told Russell that the two baggies contained cocaine, which he said he planned to sell to pay his bills.

Peterson has moved to suppress all evidence that the police obtained following the traffic stop and the strip search.[18] Peterson contends that (1) the officers lacked probable cause to search the Mercedes at the roadside, (2) the affidavit in support of the search warrant for Peterson's car omitted relevant information regarding probable cause, (3) the affidavits in support of the search warrants that Aziz obtained to search the contents of the cell phones lacked a sufficient nexus between the items to be searched and the alleged crime; and (4) Hagen's strip search of Peterson after the magistrate released Peterson on an unsecured bond violated the Fourth Amendment.[19]

## II. DISCUSSION

### A. The Warrantless Search Following the Traffic Stop

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Searches without a warrant are per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court, however, has recognized several exceptions to the warrant requirement. Under the automobile exception, officers may search a car without a warrant if they have probable cause to believe that the car contains contraband. *United States v. Ross*, 456 U.S. 798, 809 (1982). Accordingly, the government must prove by a preponderance of the evidence that the officers had probable cause to search Peterson's car without a warrant. *United States v.*

---

[18] Peterson does not challenge the validity of the initial traffic stop.
[19] Peterson has also moved to suppress his statements following the strip search because he says that he made those statements without a proper *Miranda* warning. The government, however, has agreed not to use those statements at trial. Accordingly, the Court will deny as moot the motion as to the statements Peterson made following the strip search.

*Matlock*, 415 U.S. 164, 177 n.14 (1974). Peterson contends that the officers lacked probable cause because Walker did not "alert" for probable cause purposes.

### 1. Drug Dog Reliability and Alert

"[A] 'reliable' dog alert establishes probable cause that illegal drugs are present." *United States v. Diaz*, No. 2:16-cr-00055, 2018 WL 1697386, at \*14 (D.S.C. Apr. 6, 2018) (quoting *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). Ultimately, "[t]he question . . . is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

### a. Reliability

To establish Walker's reliability, the government submitted Walker's certifications from the Virginia State Police Working Dog Association and Lewis' training notes and monthly reports. *See* Pl.'s Ex. 6, 8. Lewis' notes and reports describe Walker's drug detection activities both in the field and in controlled training. In controlled training settings, Walker successfully gave a weak response approximately 95 percent of the time. In the field, however, Walker successfully gave a weak response only 52 percent of the time.

Although "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments," *Harris*, 568 U.S. at 246, Walker's performance in the field casts doubt on his reliability. *See id.* at 247 (noting that "[f]ield records may sometimes be relevant" in evaluating a drug dog's reliability). After "weigh[ing] the competing evidence" submitted at the suppression hearing, the Court finds Walker's reliability neutral at best.

### b. Alert

"[E]ven assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause." *Id.* at 247. "Whether a dog alerts is a question of fact for th[e] Court to resolve." *United States v. Wilson*, 995 F. Supp. 2d 455, 473 (W.D.N.C. 2014). Courts generally recognize that drug dogs indicate to their handlers that they detect drugs in one of two ways: (1) the dog gives a strong response, or its conditioned response (here, when Walker sits), or (2) the dog gives a weak response, or some other change in behavior (here, when Walker "casts" or stops and stares). *See, e.g., Diaz*, 2018 WL 1697386, at *13 (explaining the difference between an "alert" and an "indication").

Courts, however, have not adopted a uniform approach when determining the sufficiency of a drug dog's response. *Compare United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("We decline to adopt the stricter rule urged by [the defendant], which would require the dog to give a final indication before probable cause is established."), *with United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998) ("[C]asting is too distantly related to an alert to create reasonable suspicion on its own as a matter of law."). "The Fourth Circuit has not yet determined what the proper 'alert' standard is for a drug detection dog." *Diaz*, 2018 WL 1697386, at *13.

Nevertheless, several district courts within the Fourth Circuit have addressed the "alert" standard for drug dogs. In *Wilson*, the government relied on a drug dog's weak response to justify a prolonged traffic stop. 995 F. Supp. 2d at 472. The court found that the dog's weak response did not qualify as an "alert," so the police lacked reasonable suspicion to prolong the stop. *Id.* at 475. Similarly, in *Diaz*, the police searched a car following a traffic stop based on a drug dog's weak response. 2018 WL 1697386, at *13. Citing *Wilson*, the court in *Diaz* found that the drug

dog's weak response did not qualify as an "alert" for probable cause purposes. *Id.* at *14. In other words, *Wilson* and *Diaz* held that only a strong response qualifies as an "alert."

In this case, Lewis testified that Walker indicated that he smelled drugs on three occasions. First, Walker "casted" by the driver's side headlight of Peterson's car. Hr'g Tr. at 24:25. Second, Walker stopped and looked at Lewis by the passenger's side door. *See id.* at 32:22-33:2. Finally, Walker stopped, paused, and looked back at Lewis when Walker smelled Peterson's right hand. *See id.* at 35:6-11. At no point during the traffic stop, however, did Walker sit, which is a strong response. Because Walker failed to give a strong response, he did not "alert" for probable cause purposes. Standing alone, therefore, Walker's three weak responses did not give the officers probable cause to search Peterson's car without a warrant. *See Wilson*, 995 F. Supp. 2d at 475 ("To allow a search predicated upon an officer's interpretation of the utterly minimalist lesser showing exhibited by the dog in this case would be tantamount to permitting law enforcement officers to issue their own search warrants based upon their own subjective analysis.").

### 2. *Additional Facts Establishing Probable Cause*

Unlike the officers in *Wilson* and *Diaz*, the officers in this case had much more than Walker's weak responses to establish probable cause to search Peterson's car. *Cf. Diaz*, 2018 WL 1697386, at *13 ("It is undisputed that it was based solely on [the dog's] 'alert' that the officers believed they had probable cause to search the car."); *Wilson* 995 F. Supp. 2d at 476 ("[T]he officers had no reason, apart from the purported alert by [the drug dog], to justify prolonging the stop."). Peterson's short travel to a known source city, Lewis' extensive involvement in the investigation into Peterson, and Peterson's interactions with Russell and Lewis at the roadside— taken together with Walker's three weak responses—add up to probable cause to search the car without a warrant.

14

First, before Russell stopped Peterson, he had met with Lewis, Sadler, and other officers. Russell learned that the officers had a GPS tracker on Peterson's car and that Peterson was traveling south from the high-crime area and heroin source city of Baltimore. Specifically, the officers told Russell that Peterson had made a brief stop on West Fayette Street in Baltimore, which Aziz knew to be "a heroin corridor." *Id.* at 288:15-16. While "presence in an area of expected criminal activity, *standing alone*, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) (emphasis added), courts may consider "the context of a high-crime area" when "assessing the totality of the circumstances," *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004); *see also United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (noting that the defendant's brief trip to "a known source city for illegal narcotics" was relevant in determining whether the police had reasonable suspicion to order a drug dog sniff).

Second, Lewis—the officer who searched the Mercedes—"play[ed] an integral part in" the investigation into Peterson, participated in the surveillance of Peterson before the traffic stop, took part in some of the interviews with Queen, and knew about Queen's text messages with Peterson. *See* Hr'g Tr. at 294:19-295:6. Lewis also knew about Peterson's brief trip to Baltimore. Accordingly, "at the time of the traffic stop," Lewis "had knowledge of facts—either directly or based on knowledge shared by [Aziz and other members of the Task Force]—that, in the totality of the circumstances, gave him probable cause to believe that the vehicle contained illegal contraband." *United States v. Kerns*, No. 2:15-cr-217, 2016 WL 5745117, at *9 (S.D. W. Va.

Sept. 30, 2016) (noting that the police had probable cause to believe that the car contained illegal drugs "well before the drug dog was deployed for a sniff of the vehicle's exterior").[20]

Third, Peterson's interactions with Russell and Lewis reasonably led to the suspicion that Peterson had contraband in the car. When Russell asked Peterson if he had anything in the car, Peterson said that he recently had the car detailed, so Russell would not find anything. Hr'g Tr. at 154:8-13. A reasonable interpretation of Peterson's statement is that he previously had contraband in the car. Peterson also told Russell and Lewis that he had held "some marijuana" in his hand earlier that day before returning to Richmond, but that the marijuana did not belong to him. *Id.* at 154:15-23; *see also id.* at 157:20-25. Although Walker's weak response to Peterson's hand alone did not give rise to probable cause, it was at least consistent with Peterson's statements that he previously held marijuana in his hand.[21] *Cf. Wilson*, 995 F. Supp. 2d at 475 (finding that the drug dog's weak response did not qualify as an alert, but noting that "some lesser, yet objectively definite, indication by a dog may be sufficient to fulfill this standard under some circumstances").

Although Walker's three weak responses alone did not give the officers probable cause to believe that Peterson's car contained illegal drugs, the totality of the circumstances in this case did

---

[20] Peterson does not challenge Lewis' knowledge of the investigation and the facts relating to probable cause to search the car. In any event, Aziz kept Lewis apprised of the larger Task Force investigation into Peterson. Aziz also instructed the officers to conduct the traffic stop based on his knowledge of Peterson's drug trafficking activities and travel to the heroin source area in Baltimore. Accordingly, Aziz's knowledge of Peterson's activities and travel to Baltimore "is imputed to" Lewis as "the acting officer." *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) ("[W]hen an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself.").

[21] The Court, however, considers neither Peterson's nervousness nor his "clinching" in response to Russell's pat down of Peterson's groin area relevant to the probable cause analysis. *See, e.g.*, *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018) ("[A] driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police."). Moreover, most people would "clinch" in response to a pat down in the groin area.

establish probable cause. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."). Accordingly, "a reasonable officer would have a 'reasonable ground to believe' that drugs were in the vehicle." *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012). The Court, therefore, will deny the motion to suppress the evidence seized following the search of Peterson's car.

### B. Searches Conducted Pursuant to a Warrant

#### 1. The Search Warrant for the Car

After obtaining a search warrant for the car, the officers conducted a further search. Peterson contends that the affidavit in support of the search warrant for the car did not establish probable cause. "When presented with a search warrant, the magistrate's task 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Person*, 694 F. App'x 889, 890 (4th Cir. 2017) (quoting *Gates*, 462 U.S. at 238). Courts consider whether the affidavit "provide[d] the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 891. Courts afford "great deference" to a magistrate's probable cause determination. *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994).

Sadler's affidavit in support of the search warrant for the car cited Walker's weak responses, but did not mention additional facts about the investigation into Peterson or his travel to Baltimore. Specifically, Sadler reported Walker's "casting" by the front of the Mercedes and Walker's "alert" by the passenger's side door. *See* Pl.'s Ex. 4, at 3 & Attach. A. Sadler further

noted that "illegal drug distributors commonly utilized traps and other hiding locations [in their cars] for their illegal narcotics to avoid detection by Law Enforcement." *Id.* at Attach. A.

Although Walker's weak responses alone did not establish probable cause, the good faith exception saves the search. *See United States v. Leon*, 468 U.S. 897 (1984). Usually, "'a warrant issued by a magistrate . . . suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Id.* at 922 (quoting *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982)); *see also United States v. Loy*, 569 F. Supp. 2d 601, 609-10 (N.D. W. Va. 2008) ("[E]vidence obtained pursuant to a search warrant issued by a magistrate judge that was based on less than probable cause may still be admissible provided that the police officers who obtained and executed the warrant relied on the warrant in good faith."). Accordingly, searches executed "pursuant to a warrant will rarely require any deep inquiry into reasonableness." *Leon*, 968 U.S. at 922.

The good faith exception, however, does not apply when (1) the affiant misled the magistrate "in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) the magistrate "wholly abandoned his judicial role;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient" under the circumstances, in that it fails "to particularize the place to be searched or the things to be seized," such that an officer could not "reasonably presume it to be valid." *United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (internal citations and quotations omitted).

Peterson asserts that Sadler exhibited a "reckless disregard for the truth" because he did not include information that a box of fried chicken was in the front passenger's seat of the car.[22] According to Peterson, the fried chicken explains Walker's weak response by the passenger's side door. Lewis testified, however, that Walker "does not alert on chicken bones" or "on any food whatsoever," Hr'g Tr. at 44:12-13, and Peterson has provided no persuasive evidence to the contrary. *See United States v. Nesbitt*, No. 2:08-cr-1153-DCN, 2010 WL 2219210, at *3 (D.S.C. May 28, 2010) (applying the good faith exception when "nothing in the record support[ed] any of defendant's speculative assertions"). Accordingly, Sadler's failure to mention the fried chicken does not amount to a "reckless disregard for the truth." *Doyle*, 650 F.3d at 467.

Nor has Peterson made the requisite showing entitling him to a hearing to contest the presumptive validity of the search warrant affidavit. A defendant is entitled to a hearing into the truth of a warrant affidavit only if he makes a "substantial preliminary showing," *Franks v. Delaware*, 438 U.S. 154, 170 (1978), that "(1) the warrant affidavit contained a deliberate falsehood or statement made with reckless disregard for the truth and (2) without the allegedly false statement, the warrant affidavit is not sufficient to support a finding or probable cause." *United States v. Fisher*, 711 F.3d 460, 468 (4th Cir. 2013) (citation and internal quotation marks omitted).

---

[22] To the extent that Peterson argues that the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" because Sadler failed to include information about Walker's training or success rate, *id.*, that argument fails. As the Court explained above, the question of whether a drug dog's weak response alone can establish probable cause remains unanswered in the Fourth Circuit and has split the courts of appeals. *See United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (noting that the third circumstance under *Leon* requires "a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place"). Sadler's reliance on Walker's weak responses thus qualifies as "objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919.

A defendant must make that "substantial preliminary showing" by way of "[a]ffidavits or sworn or otherwise reliable statements" as an "offer of proof." *Franks*, 438 U.S. at 170-71. Conclusory allegations of falsity or the "mere desire to cross-examine" are insufficient. *Id.* Unless a defendant first meets his burden under both the falsity and the materiality prongs of *Franks*, he is not entitled to an evidentiary hearing to explore the veracity of a warrant affidavit. *Id.* at 171-72; *see also United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008) (describing the defendant's burden as a "heavy one to bear").

Peterson has not shown that the affidavit in support of the search warrant for the car "contained a deliberate falsehood or statement made with reckless disregard for the truth." *Fisher*, 711 F.3d at 468. As the Court explained above, Peterson has offered no evidence suggesting that Sadler acted with reckless disregard for the truth by omitting the fried chicken from the affidavit. *See Tate*, 524 F.3d at 454 ("When relying on an omission, rather than on a false affirmative statement, [the defendant's] burden increases yet more."). Because the good faith exception applies, the Court will not suppress any evidence obtained following the second car search.

### 2. *The Search Warrants for the Cell Phones*

Peterson asserts that the affidavits in support of the search warrants for the three cell phones lack a sufficient nexus between drug trafficking and the cell phones. In considering "whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993). The nexus between the alleged crime and the items to be searched cannot not be so tenuous that the "inference becomes, in Fourth Amendment terms, an improbable leap." *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018).

In *Lyles*, the police applied for a warrant to search the defendant's house after finding three marijuana stems through a search of four trash bags outside the house. *Id.* at 790. The police thought that a search would uncover evidence showing possession of controlled substances, possession with intent to distribute controlled substances, and money laundering. *Id.* at 791. The magistrate granted a warrant permitting the police to search the entire house, including any cell phones in the home. *Id.* at 795. The police found four guns, marijuana, and drug paraphernalia in the house. The district court suppressed the evidence, finding "that the presence of only three marijuana stems . . . does not establish a fair probability that additional marijuana will be found within the home." *United States v. Lyles*, No. TDC-17-0039, 2017 WL 5633093, at *4 (D. Md. Nov. 20, 2017). The Fourth Circuit affirmed.

Unlike the affidavit in *Lyles*, Aziz's affidavits supporting the cell phone warrants "provide[d] a substantial basis for the magistrate to find probable cause to search the [cell phones] for evidence of" drug trafficking. 910 F.3d at 794. First, Aziz's affidavit described in detail the traffic stop and the facts leading up to the search of the car. Aziz mentioned Peterson's statements to Lewis and Russell that "a female companion who was with him earlier that day was smoking Marijuana in the black Mercedes," Pl.'s Exs. 1-3, at ¶ 14, and that Peterson "at one point . . . touched the bag of marijuana, but did not smoke it." *Id.* Aziz also explained that Lewis found "three cell phones on the front passenger seat and a black plastic bag from the back seat, which contained a box of Mannite." *Id.* at ¶ 16.

Aziz's experience taught him that "narcotics traffickers frequently use numerous cellular telephones to further their illegal activities and to evade detection from law enforcement." *Id.* at ¶ 6(c). Aziz further explained in the affidavits that drug traffickers maintain "[r]ecords and other evidence" of drug transactions in their cell phones, *id.* at ¶ 6(f), including "wire and electronic data

concerning telephonic contact, and text messages with co-conspirators, as well as contact lists, 'friends' lists[,] and other compilations of contact information for co-conspirators," *id.* at ¶ 6(g).

With respect to Peterson, Aziz explained that "[i]t is also common for illegal drug traffickers to utilize separate cellular telephones for customers and for sources of supply." *Id.* at ¶ 19. Because "sources of supply will provide lower-level drug traffickers with a cellular phone to be used solely for the purpose of contacting the supplier," those cell phones "would contain evidence to help identify the source of supply, as well as the locations, frequency[,] and methods of the sourcing of illegal drugs to the drug trafficker." *Id.* Additionally, drug traffickers often "have a phone that is used for customers and coconspirators to contact the drug trafficker," so the phones "would contain evidence to help identify the drug trafficker's coconspirators and customers, as well as the locations, frequency[,] and methods of the drug trafficker's distribution activities." *Id.*

Peterson asserts that the affidavits lack a sufficient nexus because "[n]early every person in a developed country such as the United States who has past the early years of elementary school uses a smart phone." (Dk. No. 101, at 5.) But every person in the United States does not have multiple cell phones. *Cf. United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) ("The evidence that [the defendant] was in possession of multiple cell phones . . . could likewise be viewed by the jury as evidence of a drug-distribution conspiracy[,] . . . particularly since a government expert testified at trial that drug dealers frequently use different cell phones to make and receive calls from their supplier, their customers, and their families."). Moreover, Aziz's affidavits contained much more detail than the mere presence of three cell phones, including information that Lewis also found a container of a common drug-cutting agent in the car together with the cell phones. *See* Pl's Exs. 1-3, at ¶ 16.

In *Lyles*, the Fourth Circuit reasoned that "[t]here is insufficient reason to believe that any cell phone in the home, no matter who owns it, will reveal evidence pertinent to marijuana possession simply because three marijuana stems were found in a nearby trash bag." *Id.* at 795. In this case, Aziz's affidavits had a much narrower scope than the affidavit in *Lyles*. Accordingly, Aziz's affidavits provided "a fair probability that contraband or evidence of a crime w[ould] be found in a particular place." *Gates*, 462 U.S. at 238.

Even if Aziz's affidavits fell short on probable cause, the good faith exception under *Leon* would apply. "The key, 'objectively ascertainable question' under *Leon*, is 'whether a reasonably well trained officer would have known that the search was illegal' in light of '*all of the circumstances*.'" *United States v. Thomas*, 908 F.3d 68, 73 (4th Cir. 2018) (emphasis in original) (quoting *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011)). "Among those circumstances are 'specific, uncontroverted facts known to the officer[],' . . . which necessarily inform the objective reasonableness of an officer's determination regarding probable cause, even if they are omitted inadvertently from a warrant application." *Id.* (quoting *McKenzie-Gude*, 671 F.3d at 460).

Peterson points out that Aziz's affidavits did not include information about text messages between Peterson and his clients. When Aziz applied for the search warrant, however, he knew about Peterson's text messages with Queen. *See* Hr'g Tr. 306:24-307:4. Accordingly, Aziz's knowledge of Peterson's text messages with Queen, although omitted from the affidavits, factors into Aziz's "objective good faith." *Thomas*, 908 F.3d at 73. Aziz "harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 46 U.S. at 926. Even if the affidavits did not establish probable cause, the Court will deny the motion to suppress the evidence obtained from the cell phones.

### C. The Strip Search

Courts apply a "'flexible test' to determine the reasonableness of a broad range of 'sexually invasive searches,'" including strip searches. *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011) (quoting *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001)). In considering the reasonableness of a strip search, courts must "balance[e] the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Specifically, courts consider the following factors: "1) the place in which the search was conducted; 2) the scope of the particular intrusion; 3) the manner in which the search was conducted; and 4) the justification for initiating the search." *Edwards*, 666 F.3d at 883.

In this case, the first factor weighs in favor of reasonableness because Hagen searched Peterson in a private shower area. *See Polk v. Montgomery Cnty.*, 782 F.2d 1196, 1201-02 (4th Cir. 1986). Nonetheless, the scope of the intrusion was as broad as possible because Peterson had to remove every article of clothing. Hagen saw a plastic baggy sticking out from the side of Peterson's groin area only after Hagen directed Peterson to take off all his clothes. *See* Hr'g Tr. 235:22-23 ("As soon as he pretty much dropped his underwear I could see it."). With respect to the manner of the search, Hagen never touched or grabbed Peterson during the search, nor did Hagen expose Peterson to any danger. When Hagen asked Peterson about the plastic attached to his groin area, Peterson simply removed two plastic baggies and handed them to Hagen. *Cf. Edwards*, 666 F.3d at 885 (noting that an officer's "use of a knife in cutting the sandwich baggie off [the defendant's] penis posed a significant and an unnecessary risk of injury" to the defendant").

The justification for the search, however, strongly weighs against reasonableness. Russell asked Hagen to search Peterson *after* Russell had twice frisked Peterson at the roadside and *after*

a magistrate had released Peterson on a personal recognizance bond. Russell had no concerns for his safety or the safety of others at Pamunkey Regional Jail—he simply had a hunch that Peterson had illegal drugs hidden under his clothes. *See Winston v. Lee*, 470 U.S. 753, 767 (1985) (holding that sexually invasive searches require "a more substantial justification"). Moreover, "[a]t no time would [Peterson] . . . be intermingled with the general jail population," *Logan*, 660 F.2d at 1013, so any concerns about inmate safety cannot justify the search. *Cf. Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 330 (2012) ("Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process.").

The government insists that Peterson remained subject to a strip search due to his continued presence at Pamunkey and because the jailors still had to fingerprint him and take his photograph. But mere presence in a jail to appear before a magistrate and for processing cannot give open license for jailors to conduct sexually invasive strip searches of arrestees. *See Logan*, 660 F.2d at 1013 ("An indiscriminate strip search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations."). In light of the scope of the strip search and the flimsy justification for it, the strip search cannot withstand constitutional scrutiny. Because the strip search violated the Fourth Amendment's reasonableness requirement, the Court will suppress the evidence seized following the strip search.

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the motion to suppress. Specifically, the Court will grant the motion as to the evidence the police obtained following the strip search, deny the motion as to the evidence obtained following both car searches, and deny as moot the motion as to the statements Peterson made following the strip search.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 24 April 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge